*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

BONNIE FARAONE and MICHAEL FARAONE,

Plaintiffs-Appellants,

v

LANSING BOARD OF WATER AND LIGHT,

Defendant-Appellee.

UNPUBLISHED
April 11, 2025
9:14 AM

No. 365804
Ingham Circuit Court
LC No. 22-0255-CZ

Before: M. J. KELLY, P.J., and LETICA and WALLACE, JJ.

PER CURIAM.

This case concerns power lines belonging to defendant, Lansing Board of Water and Light (BWL), that traverse plaintiffs' property and BWL's planned efforts to keep those lines free and clear of tree branches and vegetation. The litigation was triggered when BWL communicated to plaintiffs in 2021 that it would be trimming, cutting, and possibly removing trees on plaintiffs' property with the intent to prevent the downing, disconnection, or disruption of the power lines during storms and heavy winds. After discussions between the parties collapsed with respect to possibly moving power lines and an attempt to amicably resolve a disagreement over the nature and extent of the tree work necessary to provide for the safe and secure transmission of electricity, plaintiffs obtained a temporary restraining order (TRO) that halted BWL's vegetation-management plan. But, ultimately, plaintiffs' seven-count complaint was summarily dismissed, paving the way for BWL to move forward with its plan pending this appeal. Plaintiffs appeal as of right.[1] We affirm in part, reverse in part, and remand for further proceedings.

---

[1] We acknowledge that, with respect to most of the claims raised in this case, Bonnie Faraone was ultimately dismissed by the trial court on the ground that she was not on the legal title to the property at issue, as discussed below. However, because the parties consistently referred to both Bonnie and Michael Faraone as "plaintiffs" and the property at issue as "plaintiffs' property," we will follow suit to avoid confusion.

The primary issue in the case regards the trial court's determination, as a matter of law, that BWL has a prescriptive easement in the air space occupied by the power lines that pass over plaintiffs' property. A closely associated issue concerns the court's determination, also as a matter of law, that the scope of BWL's prescriptive easement encompasses the legal right for BWL to perform the specifically-planned maintenance work on the trees, which includes creating a 6-foot, vegetation-free clearance on each side of a secondary power line and eliminating any overhanging branches. The other issues regard an alleged trespass-nuisance created by a low-hanging power line, a takings claim under the state and federal constitutions, and an alleged Fourth Amendment violation based on the actions of an employee of Wright Tree Service, a BWL contractor, who purportedly photographed or videotaped Bonnie Faraone.

The documentation shows variations at times in the location of utility poles and power lines due, in part, to a lack of accuracy in the historical documents. Plaintiffs' property, which they purchased in 2007, is located at 717 Moores River Dr. in Lansing and is comprised of Lots 3 and 4 in Block 1 of Park Heights. Lot 4 lies to the west of and adjacent to Lot 3. Plaintiffs' house and garage are located on Lot 4, which is the smaller of the two lots, and the garage is situated at the far southeastern corner of Lot 4, with the home being located to the north of the garage. Moores River Dr. is north of the house and is an east-west street that runs in a somewhat southerly direction when heading east. There are no utility poles located directly on plaintiffs' land.

There are two competing power-line configurations as ascertained by examination of geographic information system (GIS) images, a BWL sketch, survey documents, and a site map. The current configuration of the power lines is V-shaped, which is reflected in a GIS image, the surveys, and the site map. About midway between the east and west boundaries of Lot 3 and just beyond the far southern boundary of Lot 3 is a utility pole (utility pole 1). A "secondary" power line runs from utility pole 1 in a northwesterly direction to another utility pole (utility pole 2), which is situated just beyond the far southern boundary of Lot 4, close to the southeastern corner of plaintiffs' garage. From utility pole 2, there are four service drops, i.e., power lines running from a utility pole directly to a house, and these service drops go to three neighboring homes and to plaintiffs' house. Returning to utility pole 1, aside from the power line running northwesterly to utility pole 2, there is a power line, effectively a service drop, running northeasterly to a home at 707 Moores River Dr., which property is directly adjacent to the east of plaintiffs' Lot 3. Thus, emanating from utility pole 1 are two power lines, effectively forming the V-shaped configuration, and they traverse plaintiffs' property.

The record also contains GIS images showing power-line configurations in 1938 and 2003, along with the BWL sketch, which is dated October 5, 1979, and none of these documents show the V-shaped configuration as reflected in the documentary evidence discussed in the preceding paragraph. Instead, they reveal a utility pole (utility pole 3) near the southern boundary of the property at 707 Moores River Dr., with the GIS images showing utility pole 3 within the boundaries of 707 Moores River Dr. and the 1979 BWL sketch depicting utility pole 3 as being situated just south of the property line for that address.[2] From utility pole 3, a power line ran in a

---

[2] The southern borders of plaintiffs' Lot 3 and 707 Moores River Dr. form a continuous line.

northwesterly path to utility pole 2. Accordingly, the secondary power line in the current configuration running from utility pole 1 and the power line that ran from utility pole 3 both end and ended at utility pole 2. When comparing the paths of those two lines, the former power line running from utility pole 3 crossed plaintiffs' Lot 3 further to the north than the current secondary power line and at a lesser angle.

The significance of the location of the utility poles and powerlines and the various dates is that, for purposes of determining whether the 15-year prescriptive period was satisfied, BWL argued that the current configuration of the power lines *generally* existed at least as far back as 1979, whereas plaintiffs contended that the current V-shaped configuration of the lines came into existence sometime between 2003 and 2007 and is significantly distinct from the previous configuration. It was in the spring of 2007 that plaintiffs purchased the home and first saw the V-shaped power lines. With respect to the scope of the alleged prescriptive easement, the vegetation-management plan was implemented in 2014 after an ice storm in December 2013; however, BWL permitted plaintiffs to trim and prune their trees as they saw fit until 2021 when BWL sought to enforce its 2014 plan. Plaintiffs maintained that assuming the existence of an easement, the vegetation-management plan is not reasonably necessary for the safe enjoyment of the easement and unreasonably and unlawfully increases the burden on plaintiffs' servient estate, thereby exceeding the scope of the presumed prescriptive easement. BWL argues to the contrary. Wright Tree Service recommended the actual removal of 11 trees in plaintiffs' yard, but plaintiffs' expert opined that only four and possibly five of the trees needed to be removed.

## II. PROCEDURAL HISTORY

### A. THE COMPLAINT

On April 25, 2022, plaintiffs filed a complaint against BWL. In Count I of the complaint, plaintiffs requested the TRO. Plaintiffs alleged that BWL had never established an easement; therefore, it had no authority to trim or remove trees located on plaintiffs' property. Plaintiffs contended that if BWL were allowed to trim or remove trees absent due process, plaintiffs would suffer immediate and irreparable injury and have no adequate remedy at law because old growth trees, such as those in plaintiffs' yard, that are damaged or removed would take decades to replace. Next, plaintiffs asserted that BWL's no-overhang policy was unnecessary and did not consider the impact on the value and aesthetics of properties, that BWL insisted that it had to remove all vegetation spanning six feet around any power line pursuant to a report that did not actually provide such parameters, that BWL's standards were adopted without any public input or professional assistance, and that the standards were arbitrary and capricious as they did "not consider the type or species of the vegetation, or the age, condition, or likelihood the vegetation will present problems in the type of equipment involved."

Plaintiffs further alleged that BWL's inflexible no-overhang policy is an anomaly compared to industry standards, is almost unheard of in other urban and suburban communities, and is typically only associated with high-voltage transmission lines running through rural communities. Plaintiffs maintained that injunctive relief was necessary to block the threatened trespass and prevent damage to the trees. Plaintiffs requested a TRO to stop BWL from trimming, cutting, or removing any trees, and they asked the court to order BWL to appear and show cause why the court should not enter a preliminary injunction.

In Count II of the complaint, plaintiffs sought a declaratory judgment and permanent injunction. Plaintiffs made numerous claims regarding the uniqueness and benefits of trees in general and of having trees in their backyard, claiming that irreparable harm would occur if BWL were permitted to trim or remove plaintiffs' trees. Plaintiffs asked the trial court to permanently enjoin BWL from engaging in any activity on their property, declare that BWL has no right to enter upon plaintiffs' land, award plaintiffs costs and fees, and grant plaintiffs any other appropriate relief.

In Count III of the complaint, plaintiffs alleged that BWL was attempting a regulatory taking, implicating the Takings Clauses of the United States and Michigan Constitutions. Plaintiffs asserted that BWL's conduct—a months-long threat to trespass and trim or remove plaintiffs' trees—amounted to a governmental taking. Plaintiffs alleged that a taking occurred because they had "been unable to leave their home out of fear that [BWL's] agents [would] arrive unannounced to cut or remove their trees[,]" and because of the sound of chainsaws in the neighborhood, which deprived plaintiffs of the quiet enjoyment of their property. Plaintiffs requested a judgment enjoining BWL from entering plaintiffs' property, awarding plaintiffs economic, noneconomic, and exemplary damages, and granting plaintiffs costs, interest, and attorney fees.

In Count IV of the complaint, plaintiffs alleged a claim of trespass-nuisance with respect to a purported service-drop hazard over their garage. Plaintiffs contended that the service drop posed a fire hazard because it hung too closely to a "flammable" garage and that the service drop interfered with plaintiffs' use and enjoyment of their property, creating stress and anxiety. Plaintiffs posited that the service drop was a measurable physical intrusion, an instrumentality within BWL's control, and a hazard that plaintiffs themselves could not remedy through self-help. Plaintiffs requested a judgment enjoining BWL from entering plaintiffs' property, awarding plaintiffs economic, noneconomic, and exemplary damages, and granting plaintiffs costs, interest, and attorney fees.

In Count V of the complaint, plaintiffs alleged a cause of action for intentional infliction of emotional distress (IIED) related to the service-drop hazard. Plaintiffs maintained that it was a BWL employee who first noticed the dangerous service drop and voiced concerns; however, once an amicable solution could not be reached between the parties regarding the trimming and removal of trees, BWL denied knowledge of the problematic service drop and then later told plaintiffs to call BWL's customer-service line. Plaintiffs characterized BWL's conduct and behavior as extreme, outrageous, and vindictive, which created a danger to plaintiffs' lives and caused extreme stress and anxiety. Plaintiffs noted that BWL had engaged in similar extreme and outrageous conduct in relation to a family in a different neighborhood who had also challenged BWL's tree-trimming plans, which resulted in litigation. Plaintiffs requested a judgment enjoining BWL from entering plaintiffs' property, awarding plaintiffs economic, noneconomic, and exemplary damages, and granting plaintiffs costs, interest, and attorney fees.

In Count VI of the complaint, plaintiffs alleged that BWL lacked an easement and was otherwise prohibited from cutting, trimming, or removing plaintiffs' trees on the basis of historical acquiescence or estoppel. Plaintiffs asserted that BWL had not established that it had an easement of any kind with respect to the area of the V-shaped power lines and that historical photographs did not show any power lines in the area. Plaintiffs maintained that even if BWL had an easement, it was required to renew the easement, and BWL had not performed any "maintenance on its

conduit, poles, wires, and equipment on the property for many years." Plaintiffs further alleged that even if BWL had an easement, it was estopped from asserting any right to trim the trees because BWL's General Manager, Peter Lark, had promised plaintiffs that they could trim the trees. Plaintiffs contended that given this promise by Lark, BWL should have expected it would induce action by plaintiffs of a definite and substantial character in reliance on the promise. And, according to plaintiffs, in reliance on that promise, they spent thousands of dollars regularly trimming their trees and landscaping their yard with plants. Plaintiffs asserted that in light of these circumstances, the trial court was required to enforce the promise made by Lark in order to avoid an injustice. Plaintiffs also alleged that to the extent that BWL claimed a prescriptive easement, the required elements of such an easement could not be established because Lark had left the tree trimming to plaintiffs. Plaintiffs requested a judgment enjoining BWL from entering plaintiffs' property, awarding plaintiffs economic, noneconomic, and exemplary damages, and granting plaintiffs costs, interest, and attorney fees.

In Count VII of the complaint, plaintiffs alleged a violation of the Fourth Amendment. Plaintiffs recounted an episode or encounter between Bonnie and three men from Wright Tree Service when one of the men photographed or videotaped her. Plaintiffs asserted that Wright was acting as BWL's agent at the time because the three Wright employees were present on a neighboring property for the purpose of trimming and cutting trees. Plaintiffs contended that BWL is a governmental entity that had to comply with the Fourth Amendment and that BWL violated plaintiffs' Fourth Amendment rights by the "unauthorized videotaping of a private home and its occupants." Plaintiffs alleged that the acts of the three Wright employees were objectively unreasonable. Once again, plaintiffs requested a judgment enjoining BWL from entering plaintiffs' property, awarding plaintiffs economic, noneconomic, and exemplary damages, and granting plaintiffs costs, interest, and attorney fees.

## B. BWL'S MOTION FOR SUMMARY DISPOSITION

In December 2022, BWL moved for summary disposition under MCR 2.116(C)(7), (8), and (10).[3] BWL first argued that Bonnie Faraone was not a real party in interest because the property was solely titled in Michael Faraone's[4] name as reflected in the 2007 deed. BWL next argued, in relation to Count VI of the complaint which claimed that no easement existed, that the documentary evidence established all the elements of a prescriptive easement and that, therefore, BWL was allowed to maintain its equipment on or over plaintiffs' property and prevent the interruption of electrical power service. More specifically, BWL contended that it had transmitted electric power to plaintiffs' property "since at least 1979"; therefore, it held a "prescriptive easement by virtue of the continued and uninterrupted presence of the equipment on the [p]roperty for the past 43 years." BWL further argued that plaintiffs had interfered with BWL's use of its

---

[3] Earlier in the litigation, on May 2, 2022, the trial court entered a TRO prohibiting BWL from trimming, cutting, or removing any of the trees on plaintiffs' property. After a hearing, the trial court continued the TRO by order entered on May 20, 2022.

[4] For the remainder of the opinion, we shall refer to plaintiffs by their first names when speaking of them individually.

-5-

easement and that its vegetation-management plan would not unreasonably burden plaintiffs' property.

BWL next addressed Count III, the governmental takings claim, arguing that it had not targeted plaintiffs in any manner, that there was no abuse of governmental power, that it was simply implementing a standard tree-trimming policy applicable to all properties, that plaintiffs suffered no loss, and that the claim was not ripe because no tree trimming or removal had even taken place on plaintiffs' property. With respect to Count IV, the trespass-nuisance claim, BWL argued that while it initially appeared to the naked eye that the power lines over the garage were perhaps too low, i.e., a possible service-drop hazard, measurements that were later taken revealed that the distance between the wires and the garage exceeded clearance standards. BWL also asserted that plaintiffs had suffered no damages and that the claim was not ripe. In regard to Count V, the IIED claim, BWL maintained that it was shielded by governmental immunity, that there was no service-drop hazard, and that it did not engage in any outrageous or extreme conduct.

BWL next argued that Counts I and II of plaintiffs' complaint concerned the request for a TRO and a preliminary injunction, which matters had already been litigated and were premised on alleged wrongdoing set forth in the other counts. With respect to Count VII, the Fourth Amendment claim, BWL argued that there was no supporting evidence that Bonnie was filmed or photographed, that the accused Wright employee simply sat in his truck and was looking at TikTok videos on his cellphone, and that even if Bonnie had been photographed or filmed, she had no expectation of privacy while outside her home. Finally, BWL argued that it was entitled to sanctions because plaintiffs' complaint was frivolous.

In plaintiffs' response to BWL's motion for summary disposition, they first addressed and challenged BWL's contention that it had a prescriptive easement. Indeed, plaintiffs asserted that they were entitled to summary disposition under MCR 2.116(I)(2) because there was no genuine issue of material fact that BWL did not have a prescriptive easement, nor any other kind of easement. Plaintiffs contended that BWL was relying on a previous configuration of the power lines that had since been changed. Plaintiffs claimed that the 15-year period for a prescriptive easement "began to run no earlier than 2003" and that "[i]t could have begun in late 2007," which is when plaintiffs moved into their home, "meaning there is no 15-year period to analyze." Plaintiffs maintained that BWL had the burden to prove by clear and cogent evidence that an easement existed, but the records relied on by BWL were confusing and incoherent. According to plaintiffs, the reconfiguration of the power lines involved the movement of a utility pole, and plaintiffs argued that the reconfiguration could have occurred well after 2003 "because the pole looks new."[5] Plaintiffs also asserted that BWL could not prove continuous, adverse, or hostile use because in 2011 and 2013, when Bonnie complained about the configuration of the power lines, GM Lark promised to let plaintiffs alone trim the trees, and thus, thereafter, BWL had mere permissive use, which could not ripen into a prescriptive easement.

In BWL's motion for summary disposition, it had cited MCL 560.190(d), which provides that, with respect to public utility easements, "[t]he public utilities shall have the right to trim or remove trees that interfere with their use of easements." Plaintiffs argued that this provision does

---

[5] This was a reference to utility pole 1.

not give a public utility an easement and does not define the extent to which a public utility may use an easement. Next, plaintiffs maintained that even if an easement existed, its scope was not unlimited. They contended that BWL's vegetation-management plan overly and unreasonably burdened the servient estate, i.e., plaintiffs' property. Plaintiffs stated that if there was an easement, it did "not warrant cutting a *6-foot-swath* around power lines, ground to the sky, destroying [p]laintiff's [sic] yard in order to remove vegetation which, as recently as 2014, [BWL's] vegetation policies *allowed*." They asserted that BWL's current policy was not within the original scope of any easement because until June 2014, BWL had allowed power-line overhang. Plaintiffs also argued that BWL's current plans, standards, and policies were unnecessarily extreme and harmful to the environment and that they were actually contrary to industry standards.

With respect to the governmental takings claim, plaintiffs asserted that BWL's plan would "cause tens of thousands of dollars in lost value to [p]laintiffs' property." Plaintiffs argued that Michigan law recognized that a governmental taking can arise under facts similar to those presented in this case. Next, plaintiffs addressed their trespass-nuisance claim that was premised on the alleged service-drop hazard. They maintained that BWL's measurement of the service drop did not take into account that the power lines had a downward slope and that BWL measured the distance between the garage's roof and the power lines at its greatest variance, ignoring that the distance was much shorter and under the three-foot minimum at a certain spot. According to plaintiffs, BWL's own evidence established that there was in fact a service-drop violation. Plaintiffs, requesting leave to amend their complaint, claimed that they were not seeking monetary damages on the trespass-nuisance count but only abatement of the trespass-nuisance. Plaintiffs contended that governmental immunity would not bar the claim if only declaratory or equitable relief is requested.

With regard to the IIED claim, plaintiffs argued that BWL's conduct in relation to the service drop was outrageous; however, plaintiffs were prepared to stipulate to the dismissal of the count because the claim was not sustainable under the current state of the law. As to plaintiffs' Fourth Amendment claim, plaintiffs asserted that there was a factual dispute regarding whether the worker employed by Wright was taking Bonnie's photograph or filming her. Plaintiffs maintained that they had a valid constitutional-tort claim for money damages. Finally, plaintiffs argued that should the trial court rule against them, there was no basis for sanctions.

## C. THE TRIAL COURT'S SUMMARY DISPOSITION RULING

On December 28, 2022, the trial court conducted a hearing on BWL's motion for summary disposition.[6] With respect to Count VII of the complaint—the alleged Fourth Amendment violation, the trial court ruled that the Wright employee accused of photographing or filming Bonnie denied doing so in an affidavit and that there was no evidence to the contrary; therefore, summary dismissal of the count was appropriate. In regard to Counts I, II, III, IV, and VI, the trial court dismissed the counts in relation to Bonnie only, concluding that while she may have an

---

[6] The hearing also addressed a request by BWL to enter plaintiffs' property to examine and assess the condition and location of the trees and vegetation, a request to continue the TRO, and a request to extend discovery.

equitable interest in the property for purposes of a divorce action, her lack of legal title, i.e., not being on the deed, was fatal to those five counts in the instant suit. As to Count V, the IIED claim, the court noted that plaintiffs had withdrawn that cause of action. The trial court took all of the remaining claims under advisement.

On February 28, 2023, the trial court issued a written opinion and order granting BWL's motion for summary disposition on all of the outstanding claims. The trial court examined the question regarding whether there existed a genuine issue of material fact with respect to whether BWL had a prescriptive easement over plaintiffs' property. The trial court determined that BWL had established all the elements of a prescriptive easement as a matter of law. On the element requiring continuous use for the requisite 15-year period, the court found that BWL had enjoyed utility access on the property and provided power to it since 1919. The trial court acknowledged that the power lines had "changed position slightly at some point between 2003 and 2007." The court noted that the property was deeded to Michael on May 30, 2007, and that Bonnie testified that the power lines existed in their current V-shaped configuration at the time that Michael bought the house.

The trial court next addressed plaintiffs' assertion that one of the utility poles looked new,[7] concluding that there was no evidence regarding when the pole was actually placed "or any expert testimony regarding the weathering of utility poles." The trial court further ruled:

It is clear that BWL's use of the Property is open and notorious in that the lines are plainly visible and Plaintiff[8] is, and has been, aware that the lines are present. BWL's use of the Property is also adverse and hostile, such that the use is inconsistent with the right of the owner, without permission asked or given, again, at least since Plaintiff moved into the Property in 2007. Although Plaintiff alleges that BWL's use of his Property is extremely limited ("The only 'space' the Board has ever used is the less than one-inch in diameter wire.") and that use itself is permissive, Plaintiff has not met his burden to show that that has been the case. Bonnie Faraone's deposition outlined several occasions in which Plaintiff sought assistance, maintenance, or updates to equipment from BWL, including concerns over the cost of steam at the Property, the installation of a light, and line connections that ran over the Property. Plaintiff also elicited an alleged promise from BWL employee Peter Lark to allow Plaintiff to trim his own trees, which suggests that the understanding between the parties was that Defendant did have the right to trim trees, and they instead allowed Plaintiff to do so instead at his own expense. Ms. Faraone further testified that she and Plaintiff did not want BWL to touch the trees "since the minute I lived in Lansing." In 2021, the events that ultimately gave rise to this litigation resulted in Plaintiff communicating to Defendant that BWL and/or any of its agents did not have permission to come onto the Property.

To the extent that Plaintiff argues that BWL's absence from the Property or that Peter Lark's alleged promise to allow them to trim their own trees constitutes

---

[7] The pole being discussed is utility pole 1.

[8] The trial court referred to Michael as "Plaintiff."

-8-

a voluntary cessation of the easement, this Court disagrees; an agreement allowing Plaintiff to trim their own trees does not constitute an agreement to give up all right of maintenance and repair and the necessary access required to do so. Such an agreement also does not create an issue of estoppel where the agreement is predicated [o]n an understanding that BWL had a right to maintain vegetation around its equipment, and merely allowed Plaintiff to carry out that maintenance on its behalf.

This Court finds that BWL has established and shown that it has a prescriptive easement over Lots 3 and 4, Block 1, Park Heights, City of Lansing, Ingham County, Michigan, according to the recorded plat thereof, as recorded in Liber 6 of Plats, Page 24, Ingham County Records, commonly known as 717 Moores River Drive, where its existing equipment (including but not limited to any conduit, poles, wires, service drop, and fixtures) is located. This prescriptive easement includes the same rights that exist under an express easement, including but not limited to the right to access, maintain, and repair its equipment, and the right of ingress and egress over the Property. (Citations omitted).

The trial court next addressed the arguments regarding the scope of the easement. The court first noted that MCL 560.190 grants public utilities the right to trim or remove trees that interfere with their easements. The trial court found as a matter of law that BWL's easement gave it the right "to trim and/or remove any vegetation, including without limitation tree limbs or branches that overhang, interfere with, or threaten BWL's equipment." The court later elaborated that "BWL's easement includes a right to clear vegetation to the extent necessary to effective enjoyment of the easement—in this case, not only the ability to maintain, repair, and inspect its equipment, but also to ensure the safe and reliable delivery of its service." The trial court further determined that BWL's vegetation-management plan would not unreasonably burden plaintiffs' property. The court additionally stated and ruled:

In the present case, Defendant has submitted testimonial evidence that overhang is a "significant and ongoing threat to public safety and thus must [be] trimmed or removed as part of ongoing maintenance." Specifically: "it is necessary to trim the trees marked in the Planner's Plans in order to protect the BWL's equipment on the Property. These trimmings are needed in order for BWL to preserve the reliability of its electric power system and reduce the probability of outages." Further: "The vegetation that is presently overhanging the electric power equipment on the Property must be trimmed because it also causes a potential threat to the safety of the public and to BWL's crews." Defendant also submitted the testimonial evidence of an expert in electrical engineering and the effects of vegetation on electrical distribution systems, who concluded: "all limbs that overhang BWL's electric power line and equipment should be trimmed or removed so as to no longer hang over that electric power line." Dr. Russell further states that reduction pruning is "an ineffective and impractical method for reducing the risk posed by tree branches and limbs overhanging electric power lines."

In opposition to the evidence presented by Defendant, Plaintiff produced a report by a Certified Arborist, who recognized BWL's policy regarding overhang

-9-

and clearance requirements, and offered recommendations that "meet the less severe standards" of other municipalities and power companies. However, the report does not offer an opinion regarding potential threats to public safety, work crew safety, or the ability of Defendant to safely and reliably deliver its services. Plaintiff offers no case law or statute that requires Defendant to set its policies and standards to align with other municipalities and power companies. Plaintiff offers no evidence that Defendant's policies and standards, though more strict, are not in line with industry standards. The Court finds . . . that Defendant has met its burden to show that the maintenance is both necessary for its enjoyment of its easement and not unreasonably burdensome. [Citations omitted; alteration in original.]

Accordingly, the trial court granted BWL's motion for summary disposition under MCR 2.116(C)(10) with respect to Counts I (TRO request), II (request for declaratory relief and permanent injunction), and VI (alleged absence of an easement). The court ordered the preparation of a survey showing the current configuration of BWL's power lines and the trees at issue, which was to then be entered into the record for purposes of defining the easement.

With respect to Count III of the complaint alleging a governmental taking, the trial court first indicated that plaintiffs had offered no authority for the proposition that a subjective fear of tree removal or the sounds of chainsaws in a neighborhood amount to a governmental taking. The trial court further ruled that to the extent that plaintiffs were claiming a taking due to the planned trimming and removal of trees, the claim was rendered moot by the court's determination that a prescriptive easement existed. Finally, with regard to Count IV of the complaint alleging a trespass-nuisance arising from the purported service-drop hazard over plaintiffs' garage, the trial court summarily dismissed the count under MCR 2.116(C)(8) and (10). The court concluded that plaintiffs failed to provide documentary evidence countering BWL's evidence that the result of a power-line clearance investigation confirmed that the line above plaintiffs' garage was eight and a half feet above the garage, which was consistent with safety requirements.

By order dated April 12, 2023, the trial court confirmed BWL's easement and dissolved the TRO. Subsequently, by order dated May 1, 2023, the trial court denied a motion for reconsideration filed by plaintiffs, concluding that plaintiffs had not demonstrated palpable error and were arguing the same issues previously litigated and rejected by the court. In the order, the trial court also denied a motion for sanctions brought by BWL, finding that plaintiffs' lawsuit was not frivolous, and the court granted plaintiffs' request for a stay pending exhaustion of plaintiffs' appellate remedies. Plaintiffs now appeal as of right.

III. ANALYSIS

A. WHETHER THERE EXISTS A GENUINE ISSUE OF MATERIAL FACT REGARDING THE ESTABLISHMENT OF A POWER-LINE PRESCRIPTIVE EASEMENT

1. STANDARD OF REVIEW AND (C)(10) PRINCIPLES

The prescriptive-easement and scope-of-easement issues were decided by the trial court under MCR 2.116(C)(10). We review de novo a trial court's ruling on a motion for summary disposition. *Champine v Dep't of Transp*, 509 Mich 447, 452; 983 NW2d 741 (2022). In *Anderson*

*v Transdev Servs, Inc*, 341 Mich App 501, 506-507; 991 NW2d 230 (2022), this Court recited the principles that govern the analysis of a motion brought pursuant to MCR 2.116(C)(10):

> MCR 2.116(C)(10) provides that summary disposition is appropriate when, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." A motion brought pursuant to MCR 2.116(C)(10) tests the factual support for a party's action. "Affidavits, depositions, admissions, or other documentary evidence in support of the grounds asserted in the motion are required . . . when judgment is sought based on subrule (C)(10)," MCR 2.116(G)(3)(b), and such evidence, along with the pleadings, must be considered by the court when ruling on the (C)(10) motion, MCR 2.116(G)(5). "When a motion under subrule (C)(10) is made and supported . . ., an adverse party may not rest upon the mere allegations or denials of his or her pleading, but must, by affidavits or as otherwise provided in this rule, set forth specific facts showing that there is a genuine issue for trial." MCR 2.116(G)(4).
>
> A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. The trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10). Like the trial court's inquiry, when an appellate court reviews a motion for summary disposition, it makes all legitimate inferences in favor of the nonmoving party. Speculation is insufficient to create an issue of fact. A court may only consider substantively admissible evidence actually proffered by the parties when ruling on the motion. [Quotation marks, citations, and brackets omitted.]

## 2. THE LAW OF PRESCRIPTIVE EASEMENTS

In general, an easement is an interest in real property that gives one person the right to use the land of another person for a specific purpose. *Penrose v McCullough*, 308 Mich App 145, 148; 862 NW2d 674 (2014). Michigan jurisprudence recognizes two types of easements—easements appurtenant and easements in gross. *Id*. "An appurtenant easement attaches to the land and is incapable of existence apart from the land to which it is annexed[,]" and "[a]n easement in gross is one benefiting a particular person and not a particular piece of land." *Id*. (quotation marks and citations omitted). "The land burdened by the easement is the servient estate, and the land benefited by the easement is the dominant estate." *Smith v Straughn*, 331 Mich App 209, 215; 952 NW2d 521 (2020).

"Just as ownership of land may be acquired through adverse possession, so too may an easement be acquired through prescription." *Marlette Auto Wash, LLC v Van Dyke SC Props, LLC*, 501 Mich 192, 202; 912 NW2d 161 (2018). The *Marlette* Court observed:

-11-

[I]n order for plaintiff to successfully establish a prescriptive easement, plaintiff must show clear and cogent proof of possession that is actual, continuous, open, notorious, hostile, and uninterrupted for the relevant statutory period. The possession must be so open, visible, and notorious as to raise the presumption of notice to the world that the right of the true owner is invaded intentionally, and with the purpose to assert a claim of title adversely to his, so that if the true owner remains in ignorance it is his own fault. [*Id*. at 211 (quotation marks, citations, and emphasis omitted).]

The elements giving rise to a prescriptive easement are the same as those creating title by adverse possession, except that it is unnecessary to demonstrate exclusive use. *Id*. at 202-203. "A prescriptive easement results from open, notorious, adverse, and continuous use of another's property for a period of 15 years." *Matthews v Dep't of Natural Resources*, 288 Mich App 23, 37; 792 NW2d 40 (2010); see also MCL 600.5801(4). Clear and cogent evidence approaches the level of proof beyond a reasonable doubt and is similar to the clear-and-convincing-evidence standard. *Astemborski v Manetta*, 341 Mich App 190, 199; 988 NW2d 857 (2022). Thus, in a prescriptive easement case, the evidence must clearly establish the fact of possession, and there must be little doubt as to the proper resolution of the issue. *Id*. When there exists any reasonable dispute, in light of the evidence, concerning the question of possession, the party has failed to meet his or her burden of proof. *Id*.

Plaintiffs do not dispute that BWL's possession of the power lines strung over their property is actual, open, visible, and notorious. The dispute is instead focused on whether plaintiffs' possession of the power lines was continuous or uninterrupted for a 15-year prescriptive period and whether it was adverse under claim of right, i.e., hostile as opposed to permissive.

"A continuous use [] does not necessarily mean a daily, constant, and unintermittent use; but it means that the acts constituting the use shall be of such frequency as to give notice to the owner of the land of the right claimed against him." *Dummer v United States Gypsum Co*, 153 Mich 622, 631; 117 NW 317 (1908). "[I]t is sufficient if the use be the ordinary use, and be resorted to without interruption whenever necessary in the operation of the power." *Id*. at 635 (quotation marks and citation omitted). We note that plaintiffs in this case are not claiming that there were interruptions in the use of the power lines during the time that the lines were in their current V-shaped configuration such that the possession or use was not continuous. Rather, plaintiffs argue that due to past changes in the configuration of the power lines, BWL cannot prove that possession of the currently-positioned power lines (V-shape) existed continuously for a full 15-year period, as measured by an end date of April 25, 2022—the date the complaint was filed.

In *Mulcahy v Verhines*, 276 Mich App 693, 702; 742 NW2d 393 (2007), this Court, discussing the "hostility" element of prescriptive easements, explained:

Plaintiffs argue that the trial court erred in concluding that they failed to establish the element of adverse or "hostile" use necessary for a prescriptive easement. We agree. The term "hostile," as used in the law of adverse possession, is a term of art and does not imply ill will. The claimant is not required to make express declarations of adverse intent during the prescriptive period. Adverse or hostile use is use that is inconsistent with the right of the owner, without permission

asked or given, that would entitle the owner to a cause of action against the intruder for trespassing. The use of another's property qualifies as adverse if made under a claim of right when no right exists. [Citations omitted; see also *Astemborski*, 341 Mich App at 199 (use of another person's property constitutes "adverse" use when made under a "claim of right" where no right exists; adverse or hostile use is use inconsistent with the rights of the property's owner).]

It is well established that permissive use, regardless of how long it lasts, will not result in a prescriptive easement. *Banach v Lawera*, 330 Mich 436, 440-441; 47 NW2d 679 (1951). For such as easement to arise, permissive use must end and an adverse use must continue for 15 years. *Id*. at 441. On the issue of "permission," our Supreme Court in *Marlette Auto Wash*, 501 Mich at 207-208, noted an important distinction bearing on the burden of production:

> [T]he fact that property has been used in excess of the prescriptive period for "many years" is not pertinent to whether the requirements of a prescriptive easement have been met; nor is it germane to whether the proponent of the easement is required to establish privity of estate with a predecessor in the proponent's chain of title under whose ownership a prescriptive easement had vested. Rather, when the parties seek a judicial determination conclusively settling their respective property interests, and the proponent of the alleged easement provides evidence that the easement has been used in excess of the 15-year prescriptive period by "many years," the burden of production is then shifted to the opponent of the easement to establish that the use was merely permissive.

BWL argues here that it is entitled to a presumption that its prescriptive easement arose by written grant. In *Marlette Auto Wash*, 501 Mich at 203-204, our Supreme Court acknowledged that the open, notorious, continuous, and adverse use of a way across another's property for the 15-year period and many years thereafter affords a conclusive presumption of a written grant regarding that easement. Moreover, the *Marlette Auto Wash* Court explained that when the easement has been used for something like a half century, there is no obligation to show by positive testimony that the use was claimed as a matter of right; rather, after such use the burden is on the party opposing the easement to show that use of the way was only permissive. *Id*. at 204. The Supreme Court agreed that the essence of the presumption is that any long-standing use of another person's property shifts the burden to the property owner to show that the use was permissive. *Id*. at 208. The Court also agreed that the burden of persuasion regarding a prescriptive easement remains with the easement claimant throughout trial; however, with many years of use, the burden of producing evidence shifts to the easement opponent to establish that the claimant's use was permissive. *Id*.

In this case, there is no specific evidence of permission being granted to BWL and, further, there is evidence that the power lines at issue were reconfigured or moved at least one time in the past, which may also bear on the issue whether BWL can establish its claim of a prescriptive easement.

### 3. DISCUSSION OF THE DOCUMENTARY EVIDENCE AND RESOLUTION

Plaintiffs' arguments can be broken down into three broad categories. First, plaintiffs contend that changes in the configuration of the power lines necessarily restarted the clock for purposes of the statutory 15-year period and that BWL could not show by clear and cogent evidence that a full 15 years had elapsed by the date that plaintiffs' complaint was filed on April 25, 2022, with respect to the current configuration of the power lines. Second, because BWL as of 2021 was now demanding a 6-foot clearance around the power lines with no overhang, which would be an expansion of the alleged easement that had been confined to the power lines themselves, a 15-year period simply could not be established for an easement that included the power lines and the 6-foot clearance because there had never previously been a 6-foot clearance around the lines. Third, and finally, plaintiffs assert that BWL's use of their property for stringing and maintaining the power lines was by plaintiffs' permission; therefore, BWL's use was not hostile or adverse under claim of right, thereby defeating the claim of a prescriptive easement.

### a. THE CONFIGURATION OF THE POWER LINES

BWL takes the stance that the power lines that traverse plaintiffs' property have been located in their current configuration since at least 1979. In support, BWL relies on an affidavit by Darin Thelen, a licensed surveyor and the Supervisor of Real Property Management for BWL, photographs and a diagram attached to his affidavit, an affidavit by COO Bolan, and a GIS image.

In his affidavit, Thelen averred that he is "the custodian of records for real property documents, including but not limited to surveys, deeds, easements, and licenses." He further asserted that "[a]ccording to BWL records, BWL has facilities on and near [plaintiffs'] Property dat[ing] back at least to 1938." Thelen also averred that BWL "has provided electric service through and maintained its facilities since at least 1938." He additionally claimed that the power lines traversing plaintiffs' property "have been *generally* [in] the same configuration as it is now since at least 1979." (Emphasis added.) The affidavit referenced an attached exhibit, which consisted of 26 current photographs of plaintiffs' property and one diagram of the property marking the location of trees, with recommendations regarding the trimming or removal of the trees, and showing part of the power line running from utility pole 1 to utility pole 2. We note that the photos and diagram lend no support for the claim that the power lines have been in their current configuration since 1979.

In an affidavit executed by BWL's COO, David Bolan, he averred that he oversaw "the engineering and operational responsibilities for the generation and delivery of BWL's utilities, including the Vegetation Management Program for BWL." In paragraph 5 of his affidavit, Bolan averred that "[a]s part of its service of electric power, Defendant installed facilities to provide electric service when [plaintiffs'] home was built on the Property around 1919 and has maintained electric power equipment on the Property in *generally* the same configuration as it is now since at least 1979." (Emphasis added.)

With respect to the GIS image relied on by BWL, neither the V-shaped power lines running from utility pole 1 nor the utility pole itself are shown, the image has a label indicating a distribution pole installation date of May 13, 2003, and there is utility pole 3 located on the property at 707 Moores River Drive, with a power line running in a northwesterly path from that

-14-

pole across plaintiffs' yard to utility pole 2. It is the change from this power-line configuration to the V-shaped power-line configuration (line running from utility pole 1 to utility pole 2 and service drop running from utility pole 1 to residence at 707 Moores River Dr.) that needs to be examined for purposes of determining whether the 15-year prescription period was satisfied and whether the variation in the lines was even significant enough that it stopped the running of the 15-year statutory period and had to be restarted.

At the continuation of a show cause hearing on whether to issue a TRO, Ashley Thiel, who was employed by Wright Tree Service, testified that her job involved marking trees for routine trimming maintenance and informing property owners of the projects. She was asked whether a photograph of utility pole 1 looked older or newer, and Thiel responded, "It doesn't look like it's in bad shape from this picture . . . [l]ike new . . . ."

In Bonnie's deposition, she testified that the V-shaped power lines traversed the rear of plaintiffs' property. Bonnie further testified that the V-shaped power lines were in place when the property was "purchased" by plaintiffs in 2007. The following colloquy then took place in her deposition with respect to those V-shaped power lines:

Q.    You don't have any doubt that those were there in 2007?

A.    Now you make me like did I leave the coffee pot on thing.

Q.    I am not trying to trick you.

A.    Okay.

Q.    What I'm trying to establish is that when you bought the property the lines were there, and it's your good faith belief the lines were there for quite some time before you bought the property, is that fair?

A.    It's my belief that I think they were there, but I was more concerned with getting the floors redone. I wasn't paying attention, to be honest.

Q.    I get it. You don't dispute, seriously dispute that those lines haven't been there for 20 or 30 or 40 years, do you?

A.    I don't know because I haven't been there 20, 30, 40 years. I know that the [BWL] maps are all different than what is configured in my backyard.

Q.    I'm sorry. But they generally depict the same lines, right?

A.    They are in very different locations.

Initially, we will assume that the change in the power lines to the V-shaped lines or pattern started the pertinent 15-year period, as opposed to treating the change as being insubstantial such that the period continued and did not stop when the lines were moved. Plaintiffs, absent record citation, speak of purchasing the home in the spring of 2007 and moving into the home in the late fall of 2007, and BWL indicates that plaintiffs bought the house in May 2007. BWL supplied the

-15-

trial court with a special warranty deed regarding Michael's purchase of the property, and the deed is dated May 30, 2007. In a property report prepared by realtor Terry Chapman of Coldwell Banker, there is a sales date of June 14, 2007, relative to the purchase of the house. Plaintiffs' complaint was filed on April 25, 2022; therefore, the current configuration of the power lines—the V-shape—had to have been in place no later than April 25, 2007, to satisfy the 15-year prescriptive period. Bonnie's testimony reflected that the V-shaped power lines traversed the property when the home was purchased in 2007, and it does appear that the sale took place after April 25, 2007. Accordingly, the question becomes whether there was evidence that the V-shaped power lines were in existence before April 25, 2007. Remember that BWL has the burden of proof on the issue and that, in the context of its motion for summary disposition under MCR 2.116(C)(10), BWL had to submit supporting documentary evidence, MCR 2.116(G)(3)(b).

Defense counsel's attempt to have Bonnie testify and acknowledge that the V-shaped lines had likely been there for quite some time before the purchase of the home did not succeed. And even had she conceded that proposition, it still would have been speculative in nature unless there was testimony that she was familiar with the property before April 25, 2007, and had observed the V-shaped configuration; BWL does not cite any such testimony or evidence. Both Thelen and Bolan testified that the current configuration was "generally" the same as in 1979; however, use of the term "generally" suggests that there was an alteration but that the affiants deemed the change insignificant. Without elaboration, it is difficult to know what exactly Thelen and Bolan meant when they averred that the current configuration was "generally" the same. The 1979 sketch is somewhat similar to the V-shaped depictions, but the differences are significant. And the GIS image relied on by BWL has a 2003 date, yet the image plainly does not show the V-shaped power lines.

Again, BWL has the burden to establish the 15-year period by clear and cogent evidence, and it did not provide any evidence that definitively demonstrated that the V-shaped power lines existed before April 25, 2007. It could be argued that BWL's affidavits minimally sufficed for purposes of a (C)(10) motion such that the affidavits had to be countered by documentary evidence submitted by plaintiffs in order to create a genuine issue of material fact. See MCR 2.116(G)(4). And while the evidence indicated that in 2003, as based on the 2003 GIS image, there did not exist a V-shaped configuration, plaintiffs did not provide any documentary evidence that showed that the V-shaped power lines remained nonexistent from 2003 up until April 25, 2007. We conclude, however, that given the indefiniteness and vagueness of BWL's evidence, its (C)(10) motion was not made and supported as required by MCR 2.116(G)(3)(b) such that plaintiffs were mandated to submit documentary evidence to the contrary under MCR 2.116(G)(4). In that case, BWL would not be entitled to the order granting summary disposition in its favor.

Next, with respect to whether the change in the configuration of the power lines justifies or does not justify stopping the clock on the running of the 15-year prescriptive period (making the preceding analysis unnecessary if there is no justification), according to plaintiffs, it is the line running from utility pole 1 to utility pole 2 that is causing most of their distress regarding the trees, and not the area around the old line running from utility pole 3 to utility pole 2. When the two paths are compared, they plainly do not occupy the same air space and are distinct, although they do and did travel in a similar direction and end and did end at the same point. We conclude that there exists a genuine issue of material fact regarding whether the deviation or distinction is

sufficiently significant such that there was a lack of continuity and the clock on the 15-year period had to be restarted when the V-shaped power lines were installed.

### b. ALLEGED EXPANSION OF THE EASEMENT AND EFFECT ON THE 15-YEAR PRESCRIPTIVE PERIOD

Plaintiffs contend that by requiring a 6-foot clearance on the side of secondary power lines with no overhang, BWL has expanded the alleged prescriptive easement to include the lines themselves plus the clearance footage. And because BWL first demanded compliance with the 6-foot clearance in 2021, BWL cannot satisfy the 15-year prescriptive period for such an expanded easement. At first glance, plaintiffs' argument has some appeal. If the circumstances are viewed as precluding plaintiffs from placing or growing anything within the 6-foot clearance, it would seem that the easement would necessarily take a shape that matched that air space. But on closer inspection, we conclude that this argument fails. It is also noted that this issue overlaps with the issue concerning the scope of the easement, which is discussed in detail below.

Plaintiffs' particular argument does not defeat an easement that solely encompasses the power lines. And MCL 560.190(d), as indicated earlier, gives public utilities "the right to trim or remove trees that interfere with their use of easements." BWL's position is that trees and tree branches or vegetation within 6 feet of the side of a power line and any overhang effectively interfere with its power-line easements. MCL 560.190(d) does not suggest that its purpose or impact is to expand a utility company's actual easement; rather, the plain language of the statute indicates that the Legislature simply intended to provide protection for power-line easements. See *D'Andrea v AT&T Mich*, 289 Mich App 70, 74; 795 NW2d 620 (2010) ("nothing in the statute indicates that MCL 560.190 was intended to define the extent to which a public utility may use an easement").

We conclude that BWL does not have to establish that the power lines *and* a 6-foot clearance around the power lines existed for a 15-year prescriptive period. Instead, if a prescriptive easement was created because the power lines were in place for a 15-year period and the elements of prescription were satisfied, MCL 560.190(d) and the common law discussed below would then trigger the right for BWL to trim or remove trees that interfere with the easement, as long as the actions fall within the scope of the easement.

### c. ADVERSE AND HOSTILE USE AND THE ISSUE OF PERMISSION

In a November 7, 2021 letter from Michael Faraone to COO Bolan, Michael conveyed the following thoughts:

> As the owners of the home at said address, my wife and I have a long and cooperative history with the LBWL and our neighbors regarding care of our lot of several 100+ year old trees. Your records should verify that we have worked with the LBWL when trimming was requested; one minor trim done by LBWL, and on the other occasion – when a trim was requested – we hired our own service. Moreover, including those instances, since January 2010, our trees have been trimmed on our own accord so as to keep them off of powerlines and neighbor's homes, on average, once every 20 months. In 2013 my wife, Bonnie, spoke directly

with Peter Lark about the matter. We have also paid for advice from a private arborist.

By letter dated November 24, 2021, Michael informed Bolan that because Bolan had not responded to requests to resolve the matter amicably, Bolan and his "agents have no consent to enter or trespass onto th[e] property, or remove anything from it, including any part of any tree." In Bonnie's deposition, she was adamant that she did not want BWL "to touch my trees." Bonnie confirmed the allegations in the complaint about Peter Lark's promise in 2013 to let plaintiffs trim and prune their trees on their own.

Without yet taking into consideration the issue of permissive use, there was evidence that BWL's possession of the power lines was hostile and adverse under claim of right. BWL's use of the air space wherein the power lines run was inconsistent with plaintiffs' rights, ordinarily entitling plaintiffs to a cause of action for trespass. See *Mulcahy*, 276 Mich App at 702. It simply cannot be disputed that plaintiffs are prevented from utilizing the area where the power lines traverse plaintiffs' property and that BWL has treated those lines and the air space within which they run as solely its own. Therefore, the question becomes whether there exists a genuine issue of material fact on the question of adverse use when the arguments regarding permission are examined.

BWL has the burden of persuasion to demonstrate that its use or possession of the property was adverse and without permission; this burden never changes. But a preliminary issue is whether plaintiffs had the burden of first producing evidence that BWL's possession was by permission given the many years of apparent prescriptive use of the power lines in excess of the 15-year prescriptive period. We initially question whether the caselaw regarding the presumption and shifting of the burden of production is implicated because, once again, we have the change in the configuration of the power lines. The longstanding use pertained more to the previous configuration of the lines, as reflected in the 1938 and 2003 GIS images and the 1979 sketch. The caselaw relative to the conclusive presumption does not provide any specific guidance under our circumstances. But the presumption requires prescriptive use, which in turn requires continuousness or continuity; therefore, it is arguable that the presumption would not arise here. Nevertheless, it must also be remembered that this case is in the procedural posture of summary disposition under MCR 2.116(C)(10), and, as noted at the beginning of this discussion, there was evidence that BWL's possession was adverse and hostile. Accordingly, to create a genuine issue of material fact on the element of adverse use versus permissive use, plaintiffs needed to submit documentary evidence to show permission. In other words, whether it is through the common-law presumption or the mechanics of a (C)(10) motion, plaintiffs were required to submit documentary evidence showing permissive use.

Plaintiffs did not provide evidence of written or oral permission, but argue that there was implied permission in light of the fact that the parties have a contractual relationship in connection with the delivery of electrical power. Stated otherwise, because plaintiffs are paying BWL to supply them with power, plaintiffs have necessarily given BWL permission to run power lines across their property.

By contracting with BWL for power, there arguably exists a necessary implication that BWL has plaintiffs' permission to string its lines across their property in order to supply them with

electricity. This implied permission would also have pertained to plaintiffs' predecessors in interest. Technically, plaintiffs could refuse electrical service from BWL, which theoretically could occur if they employed a different source of power. On the other hand, we note that the secondary power line supplies electricity for three other residences. Moreover, assuming implied permission to run power lines over plaintiffs' property in order to supply them or their predecessors with electrical power, the implied permission did not necessarily relate to that secondary power (i.e., the line for the three other residences). So, while BWL's delivery of electricity to plaintiffs' house may show permission for a service drop to their home from some line, it did not necessarily mean that plaintiffs were implicitly permitting BWL to run the secondary power line from utility pole 1 to utility pole 2.

With respect to the fact that plaintiffs took care of trimming their trees for many years in light of and in reliance on Lark's promise that they could do so, we cannot conclude that this evidence necessarily demonstrated that BWL's possession and use of the power lines was by plaintiffs' permission. BWL's decision, via Lark, to allow plaintiffs to trim the trees did not mean that plaintiffs now controlled the air space where the power lines ran such that BWL's use or possession of the lines thereafter was by plaintiffs' grace and permission. Indeed, it somewhat tends to undermine plaintiffs' position, suggesting that, because they relied on Lark's promise to allow them to take care of the vegetation, plaintiffs did not have the freedom or control to do as they pleased. Plaintiffs instead essentially recognized BWL's claim of right and adverse control of the area. Had BWL possessed and used the power lines by plaintiffs' permission, plaintiffs seemingly would not have had to rely on Lark's promise or authorization for them to trim the trees.

Given the documentary evidence and competing arguments, we conclude that a genuine issue of material fact exists regarding whether BWL established that its possession of the power lines was adverse under claim of right, as opposed to being in possession by plaintiffs' permission.

## B. WHETHER THERE EXISTS A GENUINE ISSUE OF MATERIAL FACT REGARDING THE SCOPE OF THE ALLEGED POWER-LINE PRESCRIPTIVE EASEMENT[9]

### 1. STANDARD OF REVIEW

We review de novo a trial court's ruling on a motion for summary disposition. *Champine*, 509 Mich at 452. As noted earlier, the trial court resolved the issue regarding the scope of the alleged prescriptive easement under MCR 2.116(C)(10). And the principles pertaining to (C)(10) motions were discussed above.

---

[9] We recognize that if the trier of fact at trial concludes that BWL does not have a prescriptive easement, the issue concerning the scope of the alleged easement would be rendered moot. But the trial court's ruling regarding the scope of the alleged easement must be addressed by us because, should the trier of fact find that a prescriptive easement exists, the question relative to the scope of the easement would have to be addressed and, without a ruling by us on the matter, the scope issue would have to be resolved in BWL's favor consistent with the trial court's summary disposition ruling.

## 2. THE LAW REGARDING THE SCOPE OF EASEMENTS

In *Heydon v MediaOne*, 275 Mich App 267, 270-271; 739 NW2d 373 (2007), this Court addressed the principles regarding the scope of a prescriptive easement:

> An easement by prescription results from the use of the property of another that is open, notorious, adverse, and continuous for a period of 15 years. A prescriptive easement is generally limited in scope by the manner in which it was acquired and the previous enjoyment. One who holds a prescriptive easement is allowed to do such acts as are necessary to make effective the enjoyment of the easement unless the burden on the servient estate is unreasonably increased; the scope of the privilege is determined largely by what is reasonable under the circumstances. [Citations omitted.]

"The owner of an easement cannot materially increase the burden of the easement or impose a new and additional burden on the servient estate." *Id*. at 275; see also *Delaney v Pond*, 350 Mich 685, 687; 86 NW2d 816 (1957) ("A principle which underlies the use of all easements is that the owner of an easement cannot . . . impose thereon a new and additional burden."). The use exercised by the holder of an easement must be reasonably necessary and convenient in relation to the proper enjoyment of the easement, with as small a burden as possible to the owner of the fee. *Blackhawk Dev Corp v Village of Dexter*, 473 Mich 33, 42; 700 NW2d 364 (2005).

Although it is more than 130 years old, we find instructive for our purposes the following passage from *Harvey v Crane*, 85 Mich 316, 325; 48 NW 582 (1891):

> Applying the rules laid down by these adjudications, it seems clear to me that plaintiff is entitled to make use of this way [easement] for any and all purposes for which a road may be used; that defendant is under no obligation either to improve the bed of the way, or to protect its use; that plaintiff is entitled to do any act which may be necessary to promote its beneficial use, to the extent of inclosing the same; that the only limit to the servitude which she is entitled to impose upon the fee is what may be deemed necessary and essential to her enjoyment of the rights acquired; that the rights of defendant in this way are subject to plaintiff's necessities arising from the legitimate use of the road; that the necessity and reasonableness of the means made use of to adapt the road to her use are questions of fact, to be determined by the trial court; and that the findings of the trial court in that regard are conclusive upon us. The court below finds that the plaintiff has been accustomed daily to drive her cattle and horses through this private road, and that a fence along the same is an incident necessary to the reasonable enjoyment thereof.

Relying on *Harvey*, this Court in *Lakeside Assoc v Toski Sands*, 131 Mich App 292, 300; 346 NW2d 92 (1983), stated that an easement holder has the right to take actions as are incident or necessary to the beneficial use and enjoyment of the easement.

More recently, in *Panhandle Eastern Pipe Line Co v Musselman*, 257 Mich App 477, 481; 668 NW2d 418 (2003), this Court once again observed that an easement holder has all rights that are incident or necessary to the reasonable and proper enjoyment of the easement. The *Musselman* panel also stated "that, in Michigan, an owner of a pipeline easement is entitled to reasonable

access to the land for maintenance and repair purposes." *Id*. The Court noted that "[s]everal other jurisdictions have . . . held that if a landowner plants trees or in some other way interferes with the maintenance or surveillance of a pipeline, the pipeline owner may act to remove the interference." *Id*. at 484 n 1.

On remand to the trial court in *Musselman*, the trial court, following a bench trial, ruled that the easement holder "plaintiff was entitled to a 53-foot wide clearing of its [pipeline] easement on defendants' property." *Panhandle Eastern Pipe Line Co v Musselman*, unpublished per curiam opinion of the Court of Appeals, issued October 9, 2007 (Docket No. 268910), p 1. This Court affirmed, holding that the trial court did not clearly err because there was expert testimony supporting the need for a 53-foot-wide path, although the defendants had provided expert testimony that 10 to 30 feet would suffice. *Id*. at 2. The panel also ruled, consistent with the prior published opinion, that "regardless of its source or age, any vegetation causing an improper obstruction could be cleared pursuant to the right-of-way grant." *Id*. at 3.

Once again, "public utilities . . . have the right to trim or remove trees that interfere with their use of easements." MCL 560.190(d). And, as stated earlier in regard to MCL 560.190, "nothing in the statute indicates that MCL 560.190 was intended to define the extent to which a public utility may use an easement." *D'Andrea*, 289 Mich App at 74. In *Motes v Pacificorp*, 230 Ore App 701, 707; 217 P3d 1072 (2009), the Oregon appellate court observed:

> Although Oregon appellate courts have had occasion to consider express easements for utilities, we have not addressed prescriptive easements relating to power lines. Jurisdictions that have considered them analyze such prescriptive easements in much the same way as prescriptive easements generally, with some unique characteristics attributable to the nature of the use. A prescriptive easement to run power lines is understood to encompass the right to maintain the lines and the vegetation under and around them. [Citations omitted.]

### 3. THE RELEVANT DOCUMENTARY EVIDENCE

Plaintiffs do not argue, assuming the existence of a prescriptive easement, that BWL is not permitted to trim trees and remove vegetation that interfere with a power line. Rather, the dispute on this issue concerns the nature and extent of the planned maintenance by BWL. Ultimately, the question is whether there exists a genuine issue of material fact regarding whether implementing BWL's particular vegetation-management plan is reasonably necessary for the beneficial use and enjoyment of any prescriptive easement while not materially and unreasonably increasing the burden on the servient estate nor imposing a new or additional burden on that estate.

In his affidavit, COO Bolan laid out the general stance of BWL in favor of its vegetation-management plan and explained why it should be applied to plaintiffs' property, averring as follows:

> 6. It is necessary for BWL to be able to maintain these facilities, including performing vegetation management.

> 7. The primary cause of electric power outages and interferences are caused by trees, generally by falling on electric power lines.

8. Trees that overhang or are near electric power distribution equipment pose a significant and ongoing threat to the reliability of Defendant's electric power system and thus must be trimmed as part of ongoing maintenance of that distribution system.

9. Trees that overhang or are near electric power distribution equipment pose a significant and ongoing threat to public safety and thus must [be] trimmed or removed as part of ongoing maintenance of that distribution system.

10. Vegetation, specifically including trees, is not stagnant and the risks it poses to electric power systems are ongoing. Therefore, to provide safe and reliable electric power, BWL has a Vegetation Management Program, including trimming and removal of trees, to reduce risks from vegetation touching, near, or overhanging BWL's electric power equipment as part of its ongoing maintenance of its equipment.

11. In December 2013, the Lansing area had a significant ice storm that resulted in severe power outages.

12. As a result of the 2013 ice storm, BWL revamped its tree trimming and vegetation management practices to include more stringent trimming standards and implement a regular trimming cycle consistent with Michigan Public Service Commission ("MPSC") Response to BWL.

13. As a result of BWL's improved vegetation management practices, BWL's reliability is significantly improved. BWL's average customer outage time for tree related incidents has improved from 161 minutes in 2014 to just over 13 minutes. . . . .

14. It is my opinion that the trees marked on the Planner's Plan attached as Exhibit B hereto all pose an unnecessary risk to BWL's equipment on the Property and it is necessary to trim the tress as marked in the Planner's Plans in order to protect the BWL's equipment on the Property. These trimmings are needed in order for BWL to preserve the reliability of its electric power system and reduce the probability of outages.

15. The vegetation that is presently overhanging the electric power equipment on the Property must be trimmed because it also causes a potential threat to the safety of the public and to BWL's crews.

16. The electric power line on the Property is designed to meet the Heavy Loading Requirements for overhead electric power lines according to the National Electric Safety Code to withhold some ice but not the weight of overhanging vegetation on the Property.

17. If the overhanging limbs, branches, or trees on the Property were to fall onto or make contact with BWL's electric power equipment, there is a high probability of a significant outage to the Property and surrounding properties.

18. The only way to fully eliminate the risks to public safety and reliability of BWL's electric power system posed from the overhanging vegetation on the Property is to remove the overhanging vegetation.

Lynn McKinstry, who is the manager of electric systems operation at BWL, testified in her deposition that one of her responsibilities was overseeing the vegetation-management program. McKinstry testified that BWL's vegetation-management standards adopted on June 12, 2014, require that limbs overhanging power lines be removed, that there exist a 2-foot clearance around service drops, and that there be a 6-foot clearance on the sides of secondary lines, which carry lower voltage than primary lines. According to McKinstry, the previous standards "did allow overhang," but everything else was the same. Under the current standards, no overhang of any kind is permitted regardless of the size or length of the vegetation. McKinstry indicated that the change in policy regarding overhang was the result of the ice storm that occurred on December 3, 2013.

Ashley Thiel, an employee of Wright Tree Service who marked trees in need of removal or trimming, testified in her deposition that BWL allowed overhang back in 2010, that it later changed its position and now prohibits any overhang, and that BWL requires a 6-foot clearance on each side of a secondary power line. BWL documents executed in 2014 reflect that with respect to trees with slow or fast growth rates situated in the vicinity of a power line, any and all overhang must be removed regardless of the voltage of the line. As to fast-growth trees situated in the vicinity of open secondary power lines with voltage measurements of 125 to 400, a 6-foot side clearance is required. John Rademacher, a forester supervisor and certified arborist with BWL, testified in his deposition that there is a zero to 2-foot clearance around service drops and that there is a 6-foot clearance around secondary power lines.

With respect to Wright Tree Service's recommendations under the vegetation-management plan, it appears that it recommended the actual removal of 11 trees on plaintiffs' property, noting that removal was recommended due to either the extensive amount of trimming required, the amount of overhang, poor health and existing damage, or being located directly under power lines. Wright recommended that seven trees be trimmed. In an April 2022 email from BWL's attorney, Mark Matus, to Michael Faraone, Matus stated:

> BWL will not both "trim and remove" trees unless you request removal. Because extensive trimming can adversely affect the health of trees, removal of some of the trees was recommended. However, if you would nonetheless prefer to leave the trees in place, the BWL will simply perform the necessary extensive trimming but the risk of later removal of trees that do not survive will not be borne by the BWL.

The record includes a report by the Community Review Team (CRT) on BWL's response to the 2013 ice storm, which was overwhelmingly critical of BWL's response and made recommendations to avoid future failures. The CRT observed that "[a]djustments to the vegetation management standards must be made, especially with respect to the removal of dead trees or trees in poor condition." The CRT report did not include a recommendation that specifically called for a 6-foot setback with no overhang.

BWL presented an affidavit by B. Don Russell, who has various degrees, including a Ph.D. "in electrical engineering, with a specialty in operations and reliability of electric power distribution systems." Russell averred that he had specific expertise "in the effects of vegetation on electrical distribution systems," that the most common cause of power outages are faults that occur when tree limbs or trees fall on power lines, that downed power lines are a fire and safety hazard, that "the majority of vegetation-related outages are caused by falling overhanging limbs," that "only an aggressive program to remove overhanging branches would eliminate the potential danger and damage caused to electric conductors during storm events," and that the "removal of all overhanging branches and limbs represents the best practice for electric utility industry vegetation management and is the single most significant that can be taken." Russell further averred that the MPSC's "recommendation to BWL to remove all overhanging vegetation is consistent with best practices for electric utility industry vegetation management" and that BWL's "Vegetation Standards directive to trim or remove vegetation overhanging BWL's electric power equipment is consistent with best practices for the electric utility industry."

With respect to plaintiffs' property, Russell stated, "it is my opinion that all limbs that overhang BWL's electric power line and equipment should be trimmed or removed so as to no longer hang over the electric power line." Russell concluded his affidavit with the following averments:

22. BWL's trimming and removal of trees on [plaintiffs'] Property consistent with its Vegetation Management Standards is necessary for BWL to preserve the reliability of its electric power distribution system, reduce the probability of outages, and reduce the safety threat to the public and the BWL's crews.

23. If the overhanging limbs, branches, or hazard trees on the Property were to fall onto or make contact with BWL's electric power equipment, there is a high probability of a significant outage to the Property and surrounding properties.

24. Reduction pruning, the alternative method suggested by the Property owners is an ineffective and impractical method for reducing the risk posed by tree branches and limbs overhanging electric power lines and is not considered best practice in the industry. Reduction pruning does not eliminate the risk of a teardown of the electric power line, and it is impossible to determine the risk posed to the electric power lines by the overhanging limbs with any degree of certainty.

25. Further, reduction pruning is impractical because of the need for continual and more frequent trims, and the high expense, which would substantially affect rates charged to BWL's consumers.

26. The only way to significantly and cost-effectively reduce the risks to public safety and reliability of BWL's electric power distribution system posed by the overhanging vegetation, branches, and hazard trees on the Property is to remove the overhanging vegetation.

BWL presented a publication by the International Society of Arboriculture (ISA) titled Best Management Practices: Utility Pruning of Trees. The author, Geoffrey Kempter, set forth the purpose of utility-facility pruning:

> Trees are among the most common causes of utility service interruption. Utility pruning is undertaken to maintain an acceptable level of safety, prevent the loss of critical services, and ensure the intended use of the facility. If not properly maintained, vegetation may also damage infrastructure and impede access to utility facilities by maintenance and repair personnel.

> Utility pruning operations provide access and adequate service along easements . . . across private and public property. In some areas, government authorities have adopted performance standards such as mandatory minimum clearances between energized conductors and surrounding vegetation. Utility tree pruning programs must be designed to meet these requirements.

> Utility pruning operations should remove only those branches necessary to ensure the effective intended use of the utility space. Obtaining excessive clearance is needlessly costly, may unnecessarily injure trees, and often leads to adverse public relations. At the same time, inadequate clearance could result in service interruptions, damaged infrastructure, or safety hazards.

> Utility arboriculture specifications generally focus on the part of the tree with the greatest potential to affect the utility or facility space. The remaining portions of the tree are outside the scope of work, unless exceptions are specified. These scope limitations may be due to easement limitations, liability, the large number of individual properties involved, the need to concentrate limited resources on achieving the specified pruning objective, or a combination of these and other factors. Therefore, the scope of work is usually limited to specified areas, which often include only portions of individual trees.

Plaintiffs note the following language in the ISA's Foreword:

> Specifications should be written with the understanding that trees are living, dynamic organisms, each one unique. Practitioners in the field will encounter situations that defy expectations. Furthermore, communities and members of the public value trees for differing reasons. Practitioners of utility arboriculture must be prepared to accommodate a variety of circumstances and adjust as necessary.

Plaintiffs also point to the author's statement that "[r]emoval of overhanging limbs may or may not be appropriate, depending on the type of facility, tree species, or other site conditions." According to Kempter, "[o]verhang is never acceptable over high-priority facilities such as high-voltage electric transmission lines." There is no claim that high-voltage electric transmission lines traverse plaintiffs' property. Nowhere in the publication did the ISA suggest any specific clearance footage or measurement.

BWL notes a couple of excerpts from deposition testimony by Michael and Bonnie Faraone. In his deposition, Michael testified, "I believe the Board of Water & Light does have

some authority to maintain the vegetation around their easements, yes. Never disputed that." And Bonnie acknowledged that trees, alive or dead, can pose a danger to power lines and threaten the safety of those around downed lines.[10]

Plaintiffs rely heavily on a report prepared by their expert arborist, Victor Michael Foerster. Foerster noted the configuration of the power lines, which was consistent with the V-shaped configuration discussed earlier, acknowledging the secondary power line and the service drops and indicating that no primary power lines traverse plaintiffs' property. Foerster additionally observed that the backyard slopes to the rear (far southerly) property line, that the soil is a heavy loam that does not drain well, that neighboring trees overhang lines running over plaintiffs' property, and that soil erosion is a significant concern. He further indicated that "[i]f most of the overhead branching and foliage is removed, their absence will allow downpours to fall unimpeded," that water collecting and pooling in the rear section of the yard will drown plants and "likely . . . create a swampy environment that does not now exist," and that plaintiffs' property will "be severely damaged" if BWL performs the work recommended by Wright. After a thorough investigation of all the relevant documentation and photographs, along with an inspection of the property, Foerster made the following mitigation recommendations:

> It is my professional opinion that the proposed line clearance can be successfully modified to meet both needs – the Faraones and the Board of Water and Light. My tree removal and pruning recommendations are enclosed. The current tree work specs from the Board of Water and Light require that no tree limbs are allowed to overhang secondary 1-phase or 3-phase utility lines. Their allowable minimum side clearance is six feet. The underside clearance is three-to-four feet. According to the BWL's tree work specifications, service lines only require a 2-foot clearance in all directions. It has been my experience that other communities line clearance standards are less severe. The City of Grand Rapids clearance

---

[10] The parties devote some time discussing a 2016 case in the Ingham Circuit Court involving a suit brought by BWL against Richard and Constance Crittenden regarding a couple of trees on the Crittendens' property that BWL wished to trim in relation to overhang; however, the Crittendens did not allow BWL to proceed even though BWL had an express easement. On a motion for summary disposition, the circuit court allowed the Crittendens to trim the trees, and if BWL found the trimming job acceptable, the case would become moot, but if BWL found the work unacceptable, the motion for summary disposition could be renewed. The circuit court later modified its ruling, allowing the Crittendens to instead submit a proposal on the cost and work to be performed before actually having the job completed, and if BWL rejected the proposal, summary disposition could be revisited, which is what occurred. After visiting the site and reviewing all of the documentary evidence regarding the parties' dispute on the extent to which the tree limbs had to be trimmed, the circuit court weighed the competing interests. The circuit court decided to allow the Crittendens to trim the trees in accordance with their arborist's recommendation, which, according to the court, would suffice to alleviate BWL's concerns about the trees.

standards are enclosed as an example. (Exhibit C)[11]  It is not unusual to allow tree branches to overhang secondary and service utility lines (not primaries) so long as they don't directly interfere with service to their customers or pose an imminent risk to do so.  (Photos enclosed)  My tree removal and tree pruning recommendations meet the less severe standards suggested above.  Line clearance

---

[11] The standards employed by Grand Rapids provided:

Following pruning, desired air separation between trees and utility facilities will vary depending on whether lines are low-voltage (LV, 3 kV – 14.4kV), or high-voltage (HV, 14.4 kV – 24kV), and according to the expected growth rate of trees, as shown below:

| | |
|---|---|
| Secondary triplex (all trees) | 2.5 ft around the contact point |
| Secondary open wire (all trees) | 3 ft |
| LV slow growing trees | 10 ft |
| LV fast growing trees | 15 ft |
| High voltage (all trees) | >15 ft, more as necessary |
| Subtransmission (>24kV) | >15 ft, more as necessary |

Optimum clearance varies based on individual tree and site characteristics. Therefore, clearance distance between utility facilities and individual trees should be adjusted from the chart above as necessary based on one or more of the following:

• Tree species

• Typical form

• Expected growth rate

• Defects present

• Risk posed

• Position of tree with respect to the facility

• Other tree and site factors as appropriate.

work performed to these recommendations will protect the utility lines crossing the Faraone property and mitigate unnecessary tree losses.

## 4. DISCUSSION AND RESOLUTION

For a variety of reasons, we conclude that the trial court erred by ruling as a matter of law that BWL did not exceed the scope of its alleged prescriptive easement. One of the first issues that needs to be addressed is the role of MCL 560.190(d) in the analysis. The statutory provision does not create an easement, but it does give public utilities like BWL the authority to trim or remove trees that interfere with the use of their "easements." MCL 560.190(d). Accordingly, and generally assuming that MCL 560.190(d) is applicable, BWL has the authority to trim and remove trees that interfere with its power-line prescriptive easement. The language of MCL 560.190(d) does not define the scope of an easement; it merely prohibits any interference with the easement, however defined in scope under the law of easements. As held by this Court in *D'Andrea*, 289 Mich App at 74, "nothing in the statute indicates that MCL 560.190 was intended to define the extent to which a public utility may use an easement." Moreover, MCL 560.190(d) does not provide any definition or parameters with respect to what constitutes vegetation "interfere[nce]" with an easement. Under the common law, an easement holder can perform acts that are reasonably necessary for the effective enjoyment of the easement, *Heydon*, 275 Mich App at 270-271, and trimming and removing trees that "interfere" with a power-line easement would be actions necessarily falling under the common-law umbrella of acts that an easement holder is permitted to perform. Therefore, the remainder of our discussion on the scope of a presumed prescriptive easement will be in the context of the common law, with the understanding that BWL's rights under MCL 560.190(d) are encompassed by the common law.

One of the flaws with the trial court's ruling is that it entirely ignored the question whether BWL's vegetation-management plan materially increased the burden on plaintiffs' estate or, more importantly, whether the plan imposed a "new" or "additional" burden on the servient estate. See *Delaney*, 350 Mich at 687; *Heydon*, 275 Mich App at 270-271. The record indisputably established that the no-overhang component of the vegetation-management program did not come into existence until 2014, which was seven years after plaintiffs moved into the home, and it was also during the running of the 15-year prescriptive period, or after that period had elapsed if it commenced in 1979 as argued by BWL. Evidence that the no-overhang requirement first arose in 2014 can reasonably be characterized as evidence demonstrating the imposition of a new or additional burden on the servient estate, in that plaintiffs could no longer have trees on their property that had any branches hovering over any power line. Originally, there was no prohibition of vegetation in the air space over the power lines, and the trial court should have taken this undisputed fact into consideration.[12]

---

[12] In our view, the question whether a new or additional burden is imposed on a servient estate in the context of a power-line easement is somewhat dependent on the nature of the current use of property. For example, if a property owner did not have any trees in his or her yard, or if there were trees but none were near traversing power lines, it could not genuinely be argued that a new or additional burden was created by a no-overhang requirement. In the instant case, however,

-28-

Furthermore, the record overwhelmingly showed that overhanging branches or vegetation can pose a threat to power lines and that, generally speaking, it is reasonably necessary for the effective enjoyment of BWL's prescriptive easement to demand that overhang be removed. But, contrary to BWL's inflexible no-overhang policy, there was also evidence that there are some situations in which it is not reasonably necessary to prohibit overhang, e.g., small, light branches that would cause no harm to a power line were they to fall on the line. Aside from taking into consideration the growth rate of a tree, BWL's vegetation-management plan does not accommodate a wide variety of tree characteristics, such as those employed by the city of Grand Rapids (tree species, typical form, defects present, risk posed, position of tree, and other tree and site factors). A reasonable trier of fact could reach the conclusion that an inflexible no-overhang policy is not reasonably necessary for the proper enjoyment of BWL's prescriptive easement.

Another aspect of plaintiffs' argument is that the implementation of BWL's vegetation-management plan would likely turn plaintiffs' backyard into a swampy environment and severely damage the property. BWL did not present any documentary evidence countering this assertion by Foerster. On the basis of Foerster's opinion, a reasonable trier of fact could conclude that BWL's vegetation-management plan would materially and unreasonably increase the burden of the easement on the servient estate or impose a new or additional burden on the estate. The trial court made no mention of Foerster's contention that there would be dire environmental consequences should BWL be allowed to carry out the planned trimming and removal of trees. Even if the trier of fact found that implementation of the vegetation-management plan for plaintiffs' property is reasonably necessary for the enjoyment of the easement, the trier of fact could still rule against BWL on a determination that the damage to plaintiffs' property would be so severe or immense as to outweigh the benefit to BWL.

There can be no dispute that it is reasonably necessary for the effective enjoyment of BWL's prescriptive easement that BWL be allowed to require the trimming and possible removal of trees in order to prevent power disruptions and to safely and securely transmit electricity to homes. But this does not mean that the nature and extent of any tree trimming or removal are solely within the purview of BWL. When, as here, a homeowner has submitted evidence demonstrating that BWL's particular vegetation-management plan intended to be enforced is not reasonably necessary for the beneficial use and enjoyment of an easement or would materially and unreasonably increase the burden on the servient estate, a trier of fact must resolve whether BWL's plan can be implemented in whole or in part.

We hold that Foerster's report created a genuine issue of material fact regarding the scope of any prescriptive easement, calling into question whether the vegetation-management plan and Wright's tree-trimming and removal recommendations were reasonably necessary for the effective enjoyment of the easement or whether they unreasonably burdened plaintiffs' property. The trial court disregarded Foerster's report on the basis that it did "not offer an opinion regarding potential threats to public safety, work crew safety, or the ability of Defendant to safely and reliably deliver

---

given the numerous trees in and around the V-shaped power lines, a reasonable person could conclude that a new or additional burden was created by the no-overhang program implemented in 2014.

its services." This is not an accurate characterization of Foerster's report. As reflected in an extensive quotation of Foerster's thoughts on the various trees located in plaintiffs' backyard, which was contained in his report, Foerster weighed the hazards and risks that the trees posed to the power lines.

The trial court also criticized plaintiffs for failing to provide any evidence that BWL's policies and standards were not in line with industry standards. First, it must be mentioned that BWL never presented evidence that its 6-foot side clearance in connection with secondary power lines is an industry standard. BWL had the burden of presenting documentary evidence in support of its (C)(10) motion. See MCR 2.116(G)(4). Indeed, the documentary evidence submitted by BWL essentially established but a single point, i.e., that, for purposes of safety and the secure transmission of electricity, it is reasonably necessary for BWL to trim and remove vegetation from power lines in order to enjoy its prescriptive easement. This evidence, except portions of which plaintiffs point out, did not consider the nuances and numerous, individualized variables that a reasonable trier of fact might find should be examined when assessing whether BWL's vegetation-management plan exceeds the scope of its easement specifically in relation to plaintiffs' property. BWL's one size fits all approach, when challenged with pertinent evidence to the contrary, must be put to the test at trial.

In sum, with respect to the scope of the easement, we hold that there exists a genuine issue of material fact regarding whether implementing BWL's particular vegetation-management plan is reasonably necessary for the beneficial use and enjoyment of the assumed prescriptive easement while not materially and unreasonably increasing the burden on the servient estate nor imposing a new or additional burden on the servient estate.

## C. THE TAKINGS CLAIM

### 1. STANDARD OF REVIEW AND (C)(8) PRINCIPLES

The trial court summarily dismissed the takings claim under MCR 2.116(C)(8). We review de novo a trial court's ruling on a motion for summary disposition. *Champine*, 509 Mich at 452. In *The Gym 24/7 Fitness, LLC v Michigan*, 341 Mich App 238, 252-253; 989 NW2d 844 (2022), this Court articulated the principles that govern review of a motion for summary disposition brought under MCR 2.116(C)(8):

> The issues raised on appeal also implicate MCR 2.116(C)(8), which provides for summary disposition when a "party has failed to state a claim on which relief can be granted." MCR 2.116(C)(8) tests the legal sufficiency of a complaint. *Beaudrie v Henderson*, 465 Mich 124, 129; 631 NW2d 308 (2001). In rendering its decision under MCR 2.116(C)(8), a trial court may only consider the pleadings. *Id*. The trial court must accept as true all of the factual allegations in the complaint. *Dolan v Continental Airlines/Continental Express*, 454 Mich 373, 380-381; 563 NW2d 23 (1997). "The motion should be granted if no factual development could possibly justify recovery." *Beaudrie*, 465 Mich at 130.

-30-

## 2. TAKINGS PRINCIPLES

Under the United States Constitution, private property shall not be taken "for public use, without just compensation." US Const, Am V. "The Takings Clause of the Fifth Amendment [is] applicable to the States through the Fourteenth Amendment[.]" *Cedar Point Nursery v Hassid*, 594 US 139, 147; 141 S Ct 2063; 210 L Ed 2d 369 (2021). And under the Michigan Constitution, "[p]rivate property shall not be taken for public use without just compensation therefore being first made or secured in a manner prescribed by law." Const 1963, art 10, § 2. "While we draw on authority discussing and interpreting both clauses, we must keep in mind that Michigan's Takings Clause has been interpreted to afford property owners greater protection than its federal counterpart when it comes to the state's ability to take private property for a public use under the power of eminent domain." *Rafaeli, LLC v Oakland Co*, 505 Mich 429, 454; 952 NW2d 434 (2020).

With respect to the analysis regarding an alleged taking under the Fifth Amendment, the United States Supreme Court in *Cedar Point Nursery*, 594 US at 147-148, provided the following analytical framework:

> When the government physically acquires private property for a public use, the Takings Clause imposes a clear and categorical obligation to provide the owner with just compensation. The Court's physical takings jurisprudence is as old as the Republic. The government commits a physical taking when it uses its power of eminent domain to formally condemn property. The same is true when the government physically takes possession of property without acquiring title to it. And the government likewise effects a physical taking when it occupies property—say, by recurring flooding as a result of building a dam. These sorts of physical appropriations constitute the clearest sort of taking, and we assess them using a simple, per se rule: The government must pay for what it takes.

> When the government, rather than appropriating private property for itself or a third party, instead imposes regulations that restrict an owner's ability to use his own property, a different standard applies. Our jurisprudence governing such use restrictions has developed more recently. Before the 20th century, the Takings Clause was understood to be limited to physical appropriations of property. In *Pennsylvania Coal Co v Mahon*, 260 US 393; 43 S Ct 158; 67 L Ed 322 (1922), however, the Court established the proposition that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking. This framework now applies to use restrictions as varied as zoning ordinances, orders barring the mining of gold, and regulations prohibiting the sale of eagle feathers. To determine whether a use restriction effects a taking, this Court has generally applied the flexible test developed in *Penn Central* [*Transp Co v New York City*, 438 US 104; 98 S Ct 2646; 57 L Ed 2d 631 (1978)], balancing factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action. [Quotation marks and citations omitted.]

And in *The Gym 24/7 Fitness*, 341 Mich App at 261-263, this Court touched on inverse condemnation, partial takings, and then summarized takings jurisprudence under Michigan law:

Inverse condemnation is a de facto taking in which the government effectively takes property absent formal condemnation proceedings. *Merkur Steel Supply, Inc v Detroit*, 261 Mich App 116, 125; 680 NW2d 485 (2004). An inverse condemnation claim may be based upon the government's 'regulatory taking' of private property." *Dorman v Clinton Twp*, 269 Mich App 638, 646; 714 NW2d 350 (2006). Inverse condemnation concerns the taking of private property, and pursuant to the Taking Clauses, "a victim of such a taking is entitled to just compensation for the value of the property taken." *Hart v Detroit*, 416 Mich 488, 494; 331 NW2d 438 (1982).

Finally, . . . a temporary taking can be compensable under the Taking Clauses. *First English Evangelical Lutheran Church of Glendale v Los Angeles Co*, 482 US 304, 321; 107 S Ct 2378; 96 L Ed 2d 250 (1987); *Cummins v Robinson Twp*, 283 Mich App 677, 704; 770 NW2d 421 (2009). To summarize, there are physical takings and regulatory takings. A physical taking of private property is a categorial taking that requires the payment of just compensation. A regulatory taking involving the deprivation of all economically productive or beneficial use of property is also a categorical taking, requiring the payment of just compensation. The second type of regulatory taking—a noncategorical taking—is one that is determined upon application of the *Penn Central* balancing test. Additionally, inverse condemnation arises when the government takes property, either by physical invasion or regulation, absent formal condemnation proceedings. Finally, a taking can be either temporary or permanent. [Footnote omitted.]

### 3. DISCUSSION AND RESOLUTION

The trial court ruled that plaintiffs failed to present authority for the proposition that a subjective fear of tree removal or the sounds of chainsaws in a neighborhood amount to a governmental taking and that the takings claim was rendered moot by the court's determination that a prescriptive easement existed. Plaintiffs do not dispute and effectively concede that if BWL has an easement and if the scope of the easement allows BWL to implement its vegetation-management plan, their takings claim fails. Therein lies the flaw in plaintiffs' position, because if there is no prescriptive easement, BWL will not be able to execute its specific vegetation-management plan, and thus there would be no loss or taking. And if there is a prescriptive easement, but the vegetation-management plan exceeds the scope of the easement, BWL would still lack the authority to implement the plan, and again there would be no loss or taking. Stated otherwise, there is simply no viable takings claim in this case in its current posture. Only if BWL were to actually act outside of an easement, as defined by a court, could plaintiffs then potentially pursue a takings claim.

Moreover, the "doctrine of ripeness precludes the adjudication of contingent or hypothetical claims before an actual injury has been sustained; a matter is not ripe for judicial consideration if it rests on contingent future events that may not occur as anticipated or may not occur at all." *Green v Ziegelman*, 282 Mich App 292, 305; 767 NW2d 660 (2009). Because BWL

never cut a single branch, and because if it does so in the future, it will be operating on the basis of its easement rights as defined by a court (unless it chooses to act unlawfully), there is no ripe takings claim.

Additionally, in their complaint, plaintiffs never alleged that the value of the property would decrease should the vegetation-management plan be implemented or that the removal of trees would constitute a physical taking. Instead, as accurately stated by the trial court, the sound of chainsaws and the fear of threatened conduct by BWL served as the only bases for plaintiffs' takings claim, as alleged in the complaint. Plaintiffs no longer rely on these grounds in support of their takings claim. Only at summary disposition and now on appeal have plaintiffs expanded their takings theory, focusing on the prospective loss in property value and lost trees, but these arguments fail for the reasons indicated above. And the primary argument being posed by plaintiffs is that if BWL is allowed to act outside the scope of any assumed historical prescriptive easement, which the trial court is allegedly allowing to occur, it will result in a governmental taking. But this is simply a rehash of plaintiffs' argument regarding the scope of any easement and speculatively assumes that BWL would act outside the scope of an easement defined at the conclusion of this litigation, thereby creating a ripeness failure. Such a takings claim is not yet ripe.

## D. TRESPASS-NUISANCE CLAIM

### 1. STANDARD OF REVIEW

The trial court summarily dismissed the trespass-nuisance claim under MCR 2.116(C)(8) and (10). We review de novo a trial court's ruling on a motion for summary disposition. *Champine*, 509 Mich at 452. We earlier set forth the principles applicable to motions for summary disposition brought under MCR 2.116(C)(8) and (10).

### 2. LEGAL PRINCIPLES – TRESPASS-NUISANCE, GOVERNMENTAL IMMUNITY, AND EQUITABLE RELIEF

"Trespass-nuisance is defined as trespass or interference with the use or enjoyment of land caused by a physical intrusion that is set in motion by the government or its agents and resulting in personal or property damage. To establish trespass-nuisance the plaintiff must show condition (nuisance or trespass), cause (physical intrusion), and causation or control (by government)." *Continental Paper & Supply Co, Inc v Detroit*, 451 Mich 162, 164; 545 NW2d 657 (1996) (quotation marks and citation omitted), overruled in part on other grounds by *Pohutski v City of Allen Park*, 465 Mich 675; 641 NW2d 219 (2002). In *Pohutski*, 465 Mich at 678-679, our Supreme Court held:

> In these consolidated cases, this Court once again faces whether the plain language of § 7 of the governmental tort liability act, MCL 691.1407, permits a trespass-nuisance exception to governmental immunity. Because the Legislature's definition of the word "state" is clear and unambiguous, we hold that it does not. In so holding, we overrule *Hadfield v Oakland Co Drain Comm'r*, 430 Mich 139; 422 NW2d 205 (1988), and other cases to the contrary. However, because we are mindful of the effect our holding will have on the administration of justice, we conclude that limiting our holding to prospective application is appropriate.

Governmental immunity, while shielding a governmental agency from tort liability when monetary damages are sought, does not protect an agency when declaratory relief is sought or when there is a request for equitable relief, such as an abatement or an injunction. See *In re Bradley Estate*, 494 Mich 367, 389 n 54; 835 NW2d 545 (2013). Citing *In re Bradley Estate* in support, the Michigan Supreme Court in *Genesee Co Drain Comm'r v Genesee Co*, 504 Mich 410, 417; 934 NW2d 805 (2019), held that there are "at least two categories of claims . . . not barred by [governmental immunity]: those seeking compensatory damages for breach of contract and claims seeking a remedy other than compensatory damages."

## 3. DISCUSSION AND RESOLUTION

The trial court summarily dismissed the trespass-nuisance claim on the basis that plaintiffs failed to present documentary evidence as necessary to create a genuine issue of material fact regarding whether the service drop constituted a hazard, i.e., whether the clearance between the garage and the power line hovering over it met legal requirements. Initially, it is clear under the caselaw that plaintiffs cannot obtain money damages because trespass-nuisance is no longer an exception to governmental immunity, thereby shielding BWL from tort liability relative to damages. Nevertheless, plaintiffs could obtain equitable relief to abate the alleged trespass-nuisance, but an initial question raised by BWL is whether in their prayer for relief plaintiffs requested equitable relief or just money damages. We conclude that plaintiffs did indeed request an order enjoining BWL from continuing the trespass-nuisance. The next question is whether a genuine issue of material fact exists concerning whether there is a hazardous service drop subject to abatement.

BWL argues that plaintiffs had alleged in their complaint that the hazardous service drop existed over plaintiffs' garage, but thereafter changed their position and indicated that the pertinent service drop ran over a neighbor's garage; however, plaintiffs lacked standing to complain about a hazard to a neighbor's garage. Assuming that the purported service-drop hazard is located over the neighbor's garage, said garage and plaintiffs' garage are side by side with little space between the two. So even if the alleged hazard exists over the neighbor's garage, any resulting fire would plainly endanger both garages, giving plaintiffs standing to seek an abatement of the hazard. See *Lansing Sch Ed Ass'n, MEA/NEA v Lansing Bd of Ed*, 487 Mich 349, 372; 792 NW2d 686 (2010) (a litigant has standing if he or she has a special injury or right or has a substantial interest that will be detrimentally affected in a manner different from the citizenry at large).

In a letter written by BWL supervisor Justin Wilson, he stated:

> This letter is to inform you that there was a request for an overhead utility line clearance investigation regarding a[n] electric utility service drop over a garage at 717 Moores River Drive, Lansing. National Electric Safety Code (NESC) requires a minimum clearance over structures not readily accessible to pedestrians to be 3 feet. After investigating the utility service conductors for the customer at 717 Moores River Drive, it was determined that the line clearance exceeded the minimum required clearances. The lines were found to be 8 and ½ feet above the garage. . . .

On the second page of Wilson's correspondence, he included a photograph, which he described as follows:

> The following picture taken by a field crew member shows the height of the service drop from the garage on 717 Moores River Dr. While the angle may be deceiving, the top of the pole and service drop are close to the same height. The arrows indicate the per foot markers on the measuring pole; there are 8 arrows indicating 8 feet of clearance.

Michigan has recently adopted the NESC as the Michigan Electrical Code (MEC). See Mich Admin Code, R 408.30801. And MEC 230.24(A) provides, in part, for a 3-foot clearance "where voltage between conductors does not exceed 300 and the roof has a slope of 100mm." Although this specific provision was not cited in Wilson's letter, it clearly appears to be the basis for his reference to a 3-foot clearance. Plaintiffs cite to NESC 230.24(A), which provides, in part, for an 8-foot clearance, but plaintiffs then proceed on the assumption of a 3-foot clearance and do not argue that the 8-foot clearance must be applied. Plaintiffs rely on a photograph, which they claim depicts a clearance of less than 3 feet (34 ½ inches), and this photo appears to be of an area over the neighbor's garage and beyond the frame of the photograph that Wilson and BWL rely upon. Plaintiffs contend that BWL's photograph was purposefully cropped to hide the service-drop hazard.

On our review, plaintiffs' complaint did allege that the service-drop hazard is located over plaintiffs' garage; therefore, BWL focused on plaintiffs' garage for purposes of its motion for summary disposition. Plaintiffs did not request and have not requested an opportunity to amend their complaint, and in their appellate reply brief, they do not address BWL's assertions that plaintiffs had changed their stance by claiming a hazard over the neighbor's garage and that plaintiffs lacked standing to complain about a hazard on the neighbor's property. That said, the photograph submitted below by plaintiffs in response to the motion for summary disposition does appear to show that the hazard was over the neighbor's garage, and the photo had been obtained from BWL during discovery. Moreover, the standing argument lacks merit, and plaintiffs' photograph seems to reveal a clearance violation under the MEC. Certainly, if there truly is a danger of an electric arc and fire, it should be abated. Therefore, we remand this issue for further examination. We direct plaintiffs to supplement their initial disclosures by clarifying the exact location of the alleged hazardous service drop so that the trial court can take into consideration the photograph that plaintiffs rely on and their related arguments.

### E. THE FOURTH AMENDMENT CLAIM

#### 1. STANDARD OF REVIEW

The trial court effectively dismissed the Fourth Amendment claim on the basis of MCR 2.116(C)(10). We review de novo a trial court's ruling on a motion for summary disposition. *Champine*, 509 Mich at 452.

-35-

## 2. THE LAW REGARDING CONSTITUTIONAL TORT DAMAGES AND THE FOURTH AMENDMENT

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." US Const, Am IV. Const 1963, art 1, § 11, provides, in part, that "[t]he person, houses, papers, possessions, electronic data, and electronic communications of every person shall be secure from unreasonable searches and seizures." "The touchstone of the Fourth Amendment is reasonableness." *People v Hammerlund*, 504 Mich 442, 451; 939 NW2d 129 (2019). Plaintiffs' cause of action and their appellate argument is premised solely on the Fourth Amendment; therefore, the analysis must be restricted to examining a claim for money damages for a federal constitutional tort. "A plaintiff may sue a municipality in federal or state court under 42 USC 1983 to redress a violation of a federal constitutional right." *Jones v Powell*, 462 Mich 329, 337; 612 NW2d 423 (2000), overruled in part on other grounds by *Bauserman v Unemployment Ins Agency*, 509 Mich 673, 705-709; 983 NW2d 855 (2022). Plaintiffs, however, did not allege a § 1983 claim, nor is that federal statutory provision cited by plaintiffs in their brief on appeal.

Plaintiffs claim a Fourth Amendment violation, and they cite *Bauserman* for the proposition that money damages are available for a constitutional violation. In *Bauserman*, our Supreme Court stated and held:

> In this case, we are presented with the question of whether plaintiffs have alleged a cognizable state constitutional-tort claim allowing them to recover a judicially inferred damages remedy. Plaintiffs allege that defendant, Michigan's Unemployment Insurance Agency (the Agency), adjudicated allegations of fraud, seized plaintiffs' tax returns, and imposed penalties on plaintiffs without providing meaningful notice or an opportunity to be heard in violation of Michigan's constitutional right to due process, Const 1963, art 1, § 17. Among other remedies for this constitutional violation, plaintiffs seek monetary damages. Although we have never specifically held that monetary damages are available to remedy constitutional torts, we now hold that they are. Inherent in the judiciary's power is the ability to recognize remedies, including monetary damages, to compensate those aggrieved by the state, whether pursuant to an official policy or not, for violating the Michigan Constitution unless the Constitution has specifically delegated enforcement of the constitutional right at issue to the Legislature or the Legislature has enacted an adequate remedy for the constitutional violation. Because enforcement of Const 1963, art 1, § 17 has not been delegated to the Legislature and because no other adequate remedy exists to redress the alleged violations of plaintiffs' rights, we agree that plaintiffs have alleged a cognizable constitutional-tort claim for which they may recover money damages and we agree with the lower courts that defendant was properly denied summary disposition. [*Bauserman*, 509 Mich at 681.]

*Bauserman* involved a state constitutional-tort claim, not a federal constitutional-tort claim. Moreover, *Bauserman* concerned a state-entity defendant, not a municipality. Nevertheless, we

-36-

shall examine some Fourth Amendment principles. In *Sponick v Detroit Police Dep't*, 49 Mich App 162, 198-199; 211 NW2d 674 (1973), a police officer who was the subject of a disciplinary proceeding challenged the introduction of a videotape of him in a bar, and this Court ruled:

> The Anchor Bar is a public tavern. Therefore, people in the bar must expect to be observed by those members of the public who patronize the bar. A video tape machine, insofar as it photographs only, is merely making a permanent record of what any member of the general public would see if he entered the tavern as a patron. Accordingly, to photograph Sergeant Rickard's presence in the bar did not violate his reasonable expectations of privacy. The Fourth Amendment protects only reasonable expectations of privacy. [Quotation marks and citations omitted.]

"[T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v United States*, 389 US 347, 351; 88 S Ct 507; 19 L Ed 2d 576 (1967); see also *People v Barbee*, 325 Mich App 1, 11; 923 NW2d 601 (2018) ("we conclude that defendant did not have a reasonable or legitimate expectation of privacy in the vehicle that was parked on a public street"). "We . . . regard the area immediately surrounding and associated with the home—what our cases call the curtilage—as part of the home itself for Fourth Amendment purposes." *Florida v Jardines*, 569 US 1, 6; 133 S Ct 1409; 185 L Ed 2d 495 (2013). The basic purpose of the Fourth Amendment is to safeguard the privacy and security of persons against arbitrary invasions by governmental officials. *Carpenter v United States*, 585 US 296, 303; 138 S Ct 2206; 201 L Ed 2d 507 (2018). Finally, plaintiffs cite *Long Lake Twp v Maxon*, ___ Mich ___, ___; ___ NW3d ___ (2024) (Docket No. 164948); slip op at 2, in which our Supreme Court simply held that the exclusionary rule does not apply to a civil proceeding to enforce zoning and nuisance ordinances, declining to address whether the use of an aerial drone constituted an unreasonable search in violation of the United States or Michigan Constitutions.

### 3. DISCUSSION AND RESOLUTION

Initially, plaintiffs' cause of action for an alleged Fourth Amendment violation is problematic because BWL is not a state entity but rather a municipal entity, the claim was not based on the Michigan Constitution, and the claim was not labeled as a § 1983 action. Moreover, we fail to see how there was any Fourth Amendment "search," even accepting all of plaintiffs' allegations. See *Kyllo v United States*, 533 US 27, 32 n 1; 121 S Ct 2038; 150 L Ed 2d 94 (2001) ("When the Fourth Amendment was adopted, as now, to 'search' meant to look over or through for the purpose of finding something; to explore; to examine by inspection; as, to search the house for a book; to search the wood for a thief.") (quotation marks, alteration, and citation omitted).

Bonnie testified that on January 5, 2022, at around 9:15 a.m., three young men from Wright Tree Service appeared in a neighbor's yard in a bucket truck. When plaintiffs' dog began barking, Bonnie went outside in her pajamas and a pair of boots to investigate. She "asked them what the hell they were doing," or something to that effect. Bonnie testified that the driver of the bucket truck was hostile and rude. The Wright driver told her "don't worry about it, it's none of your business." According to Bonnie, the men did not cut anything. Bonnie testified that eventually one of the men sitting in the passenger seat of the truck while on the neighboring property held up a cellphone with two hands and directed the phone in her direction through the truck's windshield,

leaving her with the belief that he was photographing or videotaping her. Bonnie admitted that it was possible that he was playing a video game. She asserted that the young men were acting stupid and were snickering and laughing at her in a disrespectful manner, even though she could not hear them as they were in the truck. Their conduct upset her. With her cellphone, Bonnie took video and a picture of the man pointing his cellphone at her. Bonnie conceded that she had no knowledge or evidence that she had actually been photographed or videotaped.

The Wright employee accused of filming or photographing Bonnie was Kegan Hatt. Hatt averred in his affidavit that he and coworkers were on the neighboring property to trim trees on that property, that they never entered plaintiffs' property, that they were not there to trim plaintiffs' trees, that Bonnie approached the crew in an aggressive and threatening manner, demanding that they stop any trimming work, that the men then returned to their bucket truck to await management's arrival, that Hatt began watching TikTok videos on his cellphone while sitting in the truck, that upon information and belief Bonnie took a photograph of Hatt, and that he did not "record any video or take any photograph of Bonnie."

The trial court summarily dismissed the Fourth Amendment claim on the basis that plaintiffs provided no evidence contradicting Hatt's affidavit and his assertion that he did not film or photograph Bonnie. This reasoning constituted error because one could reasonably infer from the photograph that Bonnie took of Hatt that Hatt was photographing or videotaping Bonnie. Nevertheless, we affirm the trial court's dismissal of the count albeit for different reasons. See *Washburn v Michailoff*, 240 Mich App 669, 678 n 6; 613 NW2d 405 (2000) (this Court may affirm a trial court's decision when it reaches the right result albeit for different reasons). For the reasons noted earlier, we affirm on the basis that plaintiffs sought money damages but failed to allege a state constitutional-tort claim or a § 1983 claim.

Furthermore, assuming that Hatt actually videotaped or photographed Bonnie and that a "search" occurred, Bonnie was in plain view in her backyard when the incident took place; therefore, she had no reasonable expectation of privacy that would trigger Fourth Amendment protections. With respect to plaintiffs' curtilage argument, in *United States v Dunn*, 480 US 294, 301; 107 S Ct 1134; 94 L Ed 2d 326 (1987), the United States Supreme Court explained:

> Drawing upon the Court's own cases and the cumulative experience of the lower courts that have grappled with the task of defining the extent of a home's curtilage, we believe that curtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

Here, Bonnie was in her backyard, and she referenced the presence of a fence between the properties. But the facts indisputably established that Bonnie exited her home, approached the Wright employees, and initiated direct contact with them, knowingly placing herself in plain and open view. See *Kyllo*, 533 US at 33 (We have held "that a Fourth Amendment search does not occur—even when the explicitly protected location of a house is concerned—unless the individual manifested a subjective expectation of privacy in the object of the challenged search, and society is willing to recognize that expectation as reasonable.") (quotation marks, citation, and alteration

omitted; emphasis added, except for "house"). And there is no evidence or indication that the three Wright employees were unlawfully on the neighbor's property.

## IV. CONCLUSION

We hold that there exists a genuine issue of material fact regarding whether BWL has a prescriptive easement, whether its vegetation-management plan exceeds the scope of the alleged easement, and whether a trespass-nuisance arose for purposes of abatement relative to the alleged service-drop hazard. We also hold that plaintiffs stated a valid claim for trespass-nuisance, but only in regard to the claim for equitable relief.[13] Accordingly, the trial court erred by granting summary disposition in favor of BWL on these issues. But we affirm the trial court's ruling summarily dismissing the Takings and Fourth Amendment claims.

We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion. We do not retain jurisdiction. No party having fully prevailed on appeal, we decline to tax costs under MCR 7.219.

/s/ Michael J. Kelly
/s/ Anica Letica
/s/ Randy J. Wallace

---

[13] The trial court did not err by dismissing any claims for monetary damages made by plaintiffs as it pertained to the trespass-nuisance claim; however, the court erred when it dismissed plaintiffs' claims for equitable relief as it pertained to the trespass-nuisance claim.